**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SPECTRANET TECHNOLOGIES LLC, <br><br> Plaintiff, <br><br> v. <br><br> OPTIVER HOLDING B.V., OPTIVER SERVICES B.V., and COUNTY INFORMATION SERVICES, LLC, <br><br> Defendants. | Civil Action No. __1:26-cv-05857__ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff SpectraNet Technologies LLC ("SpectraNet") brings this action for patent infringement under 35 U.S.C. § 1 *et seq.*, against Defendants Optiver Holding B.V., Optiver Services B.V., and County Information Services, LLC (collectively, "Defendants") and alleges as follows:

## NATURE OF THE CASE

1.      This action arises under 35 U.S.C. § 271 for Defendants' infringement of SpectraNet's U.S. Patent Nos. 10,959,123 (the "'123 Patent"); 11,516,694 (the "'694 Patent"); and 12,414,002 (the "'002 Patent") (collectively, the "Patents-in-Suit").

## PARTIES

2.      SpectraNet Technologies LLC is a Delaware limited liability company with its principal place of business at 5830 Granite Parkway, Suite #100-216, Plano, TX 75204.

3.      Defendant Optiver Holding B.V. ("Optiver Holding") is a Netherlands private limited liability company. On information and belief, its U.S. headquarters is located at 130 East Randolph Street, Suite 800, Chicago, IL 60601.

4.      Defendant Optiver Services B.V. ("Optiver Services") is a Netherlands private limited liability company. On information and belief, its U.S. headquarters is located at 130 East Randolph Street, Suite 800, Chicago, IL 60601.

5.      Defendant County Information Services, LLC ("CIS") is a Delaware limited liability company. Upon information and belief, its principal place of business is located at 130 East Randolph Street, Suite 800, Chicago, IL 60601. CIS may be served through its registered agent CT Corporation System located at 208 S. LaSalle Street, Suite 814, Chicago, IL 60604-1101.

**JURISDICTION AND VENUE**

6.      This is an action for patent infringement arising under the provisions of the Patent Laws of the United States of America, Title 35 U.S.C. § 1 *et seq.*

7.      This Court has subject matter jurisdiction over SpectraNet's claims under 28 U.S.C. §§ 1331 and 1338(a).

8.      Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b).

9.      On information and belief, CIS has a regular and established place of business in this District. CIS is registered to do business in the state of Illinois with its principal address located at 130 East Randolph Street, Suite 800, Chicago, Illinois 60601, located within this District. On information and belief, CIS also operates multiple microwave antenna transmitters located within this District, including a microwave antenna transmitter located at 5320 West 159th Street, Oak Forest, Illinois which is registered to call sign WQXM936:

COMPLAINT FOR PATENT INFRINGEMENT                                                    2



10. Defendant CIS thus conducts and continues to conduct business in this District and has committed and continues to commit acts of patent infringement in this District. CIS directly or through subsidiaries or intermediaries (including the other Defendants in this lawsuit), ships, distributes, makes, uses, offers for sale, sells, imports, and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District and/or contributes to and actively induces its customers and others to ship, distribute, make, use, offer for sale, sell, import, and/or advertise (including the provision of interactive web pages) infringing products and/or services in the United States and in this District.

11. Defendant CIS directly, or through subsidiaries or intermediaries (including through distributors and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that those products and/or services will be purchased and used by Defendants, customers and/or consumers in this District. These infringing products and/or services have been

COMPLAINT FOR PATENT INFRINGEMENT 3

and continue to be made, used, sold, offered for sale, purchased, and/or imported by Defendants and/or their customers and/or consumers in this District.

12. This Court has both general and personal jurisdiction over CIS. CIS has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over CIS would not offend traditional notions of fair play and substantial justice.

13. Defendant Optiver Holding is a foreign company. Defendant Optiver Holding has a regular established place of business in this District. Its website identifies its Chicago location as its U.S. headquarters:

OUR LOCATIONS

**Chicago is home to Optiver's US headquarters**

Home to the Chicago Board of Trade (CBOT), CBOE and CME, Chicago was a natural next step for Optiver's North American expansion. In 2003, two years after opening its doors, Optiver Chicago merged with New York to become the firm's US headquarters. Since then, the office overlooking Chicago's famous Millennium Park has grown exponentially, attracting talent from all over the US as the firm continuously expands its trading footprint.

*See* https://optiver.com/about-us/locations/chicago/.

14. Defendant Optiver Holding also conducts and continues to conduct business in this District and has committed and continues to commit acts of patent infringement in this District. Optiver Holding directly or through subsidiaries or intermediaries (including each of the remaining defendants in this lawsuit), ships, distributes, makes, uses, offers for sale, sells, imports, and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District and/or contributes to and actively induces its customers and others to ship, distribute, make, use, offer for sale, sell, import, and/or advertise

COMPLAINT FOR PATENT INFRINGEMENT 4

(including the provision of interactive web pages) infringing products and/or services in the United States and this District.

15. Defendant Optiver Holding directly, or through subsidiaries or intermediaries (including distributors and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that those products will be purchased and used by customers and/or consumers in this District. These infringing products and/or services have been and continue to be made, used, sold, offered for sale, purchased, and/or imported by Optiver Holding, its customers, holdings, and/or consumers in this District.

16. This Court has both general and personal jurisdiction over Optiver Holding. Optiver Holding has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Optiver Holding would not offend traditional notions of fair play and substantial justice.

17. Defendant Optiver Services is a foreign company. Defendant Optiver Services has a regular and established place of business in this District. Its website identifies its Chicago location as its U.S. headquarters:

OUR LOCATIONS

Chicago is home to Optiver's US headquarters

Home to the Chicago Board of Trade (CBOT), CBOE and CME, Chicago was a natural next step for Optiver's North American expansion. In 2003, two years after opening its doors, Optiver Chicago merged with New York to become the firm's US headquarters. Since then, the office overlooking Chicago's famous Millennium Park has grown exponentially, attracting talent from all over the US as the firm continuously expands its trading footprint.

*See*, *Optiver US*, https://optiver.com/about-us/locations/chicago/ (last visited May 19, 2026).

COMPLAINT FOR PATENT INFRINGEMENT                                                                 5

18. Defendant Optiver Services also conducts and continues to conduct business in this District and has committed and continues to commit acts of patent infringement in this District. Optiver Services directly or through subsidiaries or intermediaries (including each of the remaining defendants in this lawsuit), ships, distributes, makes, uses, offers for sale, sells, imports, and/or advertises (including by providing interactive web pages) its products and/or services in the United States and in this District and/or contributes to and actively induces its customers and others to ship, distribute, make, use, offer for sale, sell, import, and/or advertise (including the provision of interactive web pages) infringing products and/or services in the United States and this District.

19. Defendant Optiver Services directly, or through subsidiaries or intermediaries (including distributors and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that those products will be purchased and used by customers and/or consumers in this District. These infringing products and/or services have been and continue to be made, used, sold, offered for sale, purchased, and/or imported by Optiver Services, its customers, holdings, and/or consumers in this District.

20. This Court has both general and personal jurisdiction over Optiver Services. Optiver Services has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Optiver Services would not offend traditional notions of fair play and substantial justice.

21. All Defendants in this action also work jointly as part of a group of commonly owned and commonly controlled organization (collectively referred to as the "Optiver Group") that have worked together as a trading firm that performed infringing acts and continues to

COMPLAINT FOR PATENT INFRINGEMENT 6

perform infringing acts in this District. On information and belief, all Defendants share the same address at 130 East Randolph Street, Suite 800, Chicago, Illinois 60601. The Optiver Group, along with other foreign and U.S.-based entities (which act as part of a global network) have operated as agents of one another and vicariously as parts of the same enterprise to work in concert together and enter into agreements closer than arm's length.

## THE ASSERTED PATENTS

22. The '123 Patent, entitled "Low Latency Wireless Messaging," issued on March 23, 2021. A true and correct copy of the '123 Patent is attached as **Exhibit 1**.

23. The '694 Patent, entitled "Low Latency Wireless Messaging," issued on November 29, 2022. A true and correct copy of the '694 Patent is attached as **Exhibit 2**.

24. The '002 Patent, entitled "Low Latency Wireless Messaging," issued on September 9, 2025. A true and correct copy of the '002 Patent is attached as **Exhibit 3**.

25. Plaintiff SpectraNet is the owner by assignment of the '123 Patent, the '694 Patent, and the '002 Patent and has the exclusive right to sue and collect remedies for past, present, and future infringements of same.

## BACKGROUND

26. SpectraNet incorporates the allegations of the foregoing paragraphs as if fully restated herein.

27. The inventions patented in the Patents-in-Suit originate from the groundbreaking work of Mr. Jeffrey Adams. In some applications, milliseconds make the difference between earning and losing millions of dollars. Mr. Adams was focused on developing the fastest possible systems and methods for reliably communicating small pieces of information over long distances.

28. Message latency refers to the length of time it takes a message to traverse a system. Mr. Adams was insightful enough to realize that multiple factors contribute to message latency, including propagation latency, the time it takes to send a message between two points, and message size latency, the time required to process the message before and after it is received.

29. Mr. Adams realized that radio waves offered propagation latency benefits other mediums could not match. First, radio waves are fast. Radio waves travel through the air at nearly the speed of light while light in fiber optic cables travels at approximately 67% of the speed of light. Second, while lower frequency radio waves have line of sight limitations, higher frequency, ionospheric transmissions allow messaging over long distances, even across oceans.

30. But this was only one piece of the puzzle. While ionospheric transmissions offered benefits in propagation latency, it posed problems related to message latency. The processing time for ionospheric radio wave transmissions is much greater than other mediums like fiber optic cables. Propagation latency gains provided by ionospheric transmissions were quickly consumed by losses in message latency as the size of the message increased. Mr. Adams found an elegant way to solve this problem. He realized that he could favorably affect message latency in ionospheric communications with encoding that was known by the receiving device thereby reducing bit-by-bit processing that was consuming latency gains.

31. Ionospheric transmissions also pose reliability problems because they are sensitive to ever-changing environmental conditions that can diminish or eliminate the latency advantage. This problem was addressed by selecting and controlling physical-layer transmission parameters (*e.g.*, carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and channel-bandwidth constraints.

32.     The '123 Patent is generally directed to methods, systems, and devices for RF transmission in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum band to a remote receiving device. A request for a particular action is received, and a particular value is encoded using a format derived to effect message latency into a message for transmission, where the particular value is known in advance to the remote receiving device as corresponding to the particular action.

33.     The claims of the '123 Patent include determining transmission parameters for wireless transmission based at least on a message latency and a predefined channel bandwidth, and controlling transmission of the encoded message using the determined transmission parameters. Example transmission parameters and constraints are identified, such as carrier frequency, modulation type, transmission power, sampling rate, and buffer size. The '123 Patent describes message latency concepts that include propagation-related considerations from origin to destination, including latency caused by radios, amplifiers, antennas, and related equipment.

34.     The '694 Patent is generally directed to methods and devices for transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message; encoding the particular message into an encoded message using a format derived to effect message latency, where the encoded message is known in advance to the remote receiving device as corresponding to the particular message, and where the encoded message is smaller than the particular message; determining transmission parameters based at least on message latency and a predefined channel bandwidth; and transmitting the encoded message using the determined transmission parameters.

35. The '694 Patent describes example transmitter-side components, including a "front end unit" adapted/configured to receive messages for wireless transmission (including, in certain embodiments, requests for financial transactions) and a controller adapted/configured to determine transmission parameters for low-latency transmission based at least on message latency and predefined channel bandwidth.

36. The '002 Patent is generally directed to methods and devices for RF transmission of a message in the ionosphere or other atmospheric layer at frequencies in the Medium Frequency (MF), High Frequency (HF), or Very High Frequency (VHF) spectrum to a remote receiving device, including: receiving a request to transmit a particular message toward a remote receiving device; encoding the particular message into an encoded message using a format derived to reduce message latency (where the encoded message is known in advance to the remote receiving device as representing the particular message and is smaller than the particular message); and transmitting the encoded message over a frequency in an ionospheric band using one or more transmission parameters selected based on estimated propagation latency and based on a predefined channel bandwidth for transmission over the ionospheric band.

37. The '002 Patent's claims further describe that estimated propagation latency for the transmission parameters may be determined for multiple transmission parameters and may be based on factors such as time of day, time of a solar cycle, time of year, number of bounces between earth and the ionosphere, and distance.

38. The '002 Patent also includes claims directed to receiver-side methods, including receiving an encoded message transmitted via the ionospheric band according to transmission parameters selected based on estimated propagation latency and chosen channel bandwidth; decoding the encoded message into a decoded message known in advance by the receiving

COMPLAINT FOR PATENT INFRINGEMENT 10

system as corresponding to the encoded message (with the decoded message longer than the encoded message); and performing an action based on decoding the encoded message.

39. The Patents-in-Suit are directed to patent-eligible, non-abstract subject matter. The claims of the Patents-in-Suit are directed to methods, systems, and devices for reducing latency in the communication of encoded messages via an ionospheric band. The claims focus on specific, technological improvements in wireless communications—namely, reducing end-to-end message latency by (i) encoding messages into compact representations that are known *a priori* to a receiving device (thereby reducing message-size-related latency), and (ii) selecting and controlling concrete, physical-layer transmission parameters (*e.g.*, carrier frequency, modulation type, transmission power, sampling rate, buffer size) based on latency considerations and channel-bandwidth constraints applicable to ionospheric communications. The claims of the Patents-in-Suit describe and claim concrete, engineering-driven techniques for reducing latency in RF transmissions, implemented in the operation of RF communication systems including ionospheric transmissions.

## ALLEGATIONS OF PATENT INFRINGEMENT

40. Defendants, jointly and/or individually, make, use, sell, offer for sale, and/or import certain products, services, and systems.

41. Defendants jointly operate as a worldwide trading firm ("Optiver"). Optiver is one of the largest players in the High Frequency Trading ("HFT") market. HFT is a form of market involvement that employs algorithms to quickly perform very large numbers of trades in response to varying market conditions.

42. In the HFT market, speed is critical. Lowering the latency of sharing trading information gives HFT firms an advantage by allowing them to capitalize on small changes in

commodity prices before other traders have time to react. For example, if the price of a commodity goes up in a U.S. market, HFT traders can trigger a "buy" trade overseas, such as in Japan or Europe, before the overseas markets have time to react. This is known as latency arbitrage.

43. While the monetary benefit for any given trade may be minimal, HFT traders use high-volume trading to leverage small profits into cumulatively huge gains.

44. It has been estimated that HFT constitutes more than 50% of trading volume in U.S. markets. *See* Anirban Banerjee & Prince Roy, *High-Frequency Traders' Evolving Role as Market Makers*, 82 PAC. BASIN FIN. J. (2023), https://www.sciencedirect.com/science/article/abs/pii/S0927538X2300255X.

45. This opportunity for large profits has produced fierce competition among HFT traders seeking to gain millisecond, microsecond, or even nanosecond advantages over their competitors.

46. HFT firms have invested hundreds of millions of dollars developing networks that save fractions of a second. *See, e.g.*, Christopher Steiner, *Wall Street's Speed War*, FORBES (July 16, 2012), https://www.forbes.com/forbes/2010/0927/outfront-netscape-jim-barksdale-daniel-spivey-wall-street-speed-war.html; *Ultra-Fast Telecom Cable from Herring Cove to Europe Nearly Complete*, CBC NEWS (Aug. 12, 2015), https://www.cbc.ca/news/canada/nova-scotia/ultra-fast-telecom-cable-from-herring-cove-to-europe-nearly-complete-1.3188581

47. Technical analysis verifies that HFT traders are commercially utilizing the High Frequency spectrum ("shortwave") communications to trade in the financial markets. This can be deduced from the time it takes overseas markets to react to changes in U.S. markets. In one analysis performed by the Head of Quantitative Analytics for the Deutsche Börse Group, the

reaction time was measured between the Chicago Mercantile Exchange and the Eurex Exchange near Frankfurt, Germany. The analysis revealed a large volume of trades occurring 9 milliseconds faster than possible using the best alternatives like optical fiber. This phenomenon was first observed in 2020 and grew to dominate trading performed at the slower speed. *See, e.g.*, Stefan Schlamp, *The Long and the Short End of the Latency Spectrum*, DEUTSCHE BÖRSE GROUP (Sept. 21, 2023), https://www.deutsche-boerse.com/resource/blob/3690190/b99127ac79c1b2753206c4df5140a535/data/Open%20Day%202023%20%20Presentation,%20The%20Long%20&%20Short%20End%20of%20The%20Latency%20Spectrum.pdf.

48.     Shortwave trading activity has similarly been identified between the Chicago and Tokyo trading markets. *See* Stephen Tyc, *Market Data vs Private Fills*, YOUTUBE (Oct. 18 2022, at 18:15), https://www.youtube.com/watch?v=a_Awz6eC0NU.

49.     The volume of trading indicates that shortwave trading activity is being used at a large, commercial scale.

50.     Optiver is a global HFT operation and CIS operates multiple antenna stations transmitting in the shortwave spectrum.

51.     For example, CIS operates an antenna station, located at 8399 W. 1050 S., Wanatah, Indiana, that is licensed to transmit radio waves with more than two dozen bands inside the shortwave spectrum using the call sign WN2XCR. CIS also operates a microwave antenna station at this same station that is licensed to receive microwave transmissions from locations in Illinois via an intermediate microwave station in Valparaiso, Indiana.



52. The Illinois microwave station, identified as ASR 1011693, receives transmissions from multiple locations closer to the Chicago Mercantile Exchange.



*See* https://wireless2.fcc.gov/UlsApp/UlsSearch/licenseSiteMap.jsp?licKey=3803040 (last visited May 19, 2026).

53. While shortwave communications provide latency advantages, they also present certain challenges. In particular, shortwave communication can be transmitted at a significantly reduced bandwidth as compared to optical fiber transmissions. *See, e.g.*, David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic. As a result, the latency advantages provided by

shortwave can be reduced if the messages being sent are too long. Thus, shortwave traders tightly encode their prices or other information in just a few bytes or bits or lose their latency advantage. *See* Bob Van Valzah, *Shortwave Trading: Part II*, SNIPER IN MAHWAH BLOG (June 7, 2018), https://sniperinmahwah.wordpress.com/2018/06/07/shortwave-trading-part-ii-faq-and-other-chicago-area-sites/. Defendants themselves admit they use their ionospheric antenna stations in conjunction with coding schemes that detect changes in information in one market place, codifies this data, and then automatically selects a queue priority to send the information via the 2-25 MHz Band link. Exhibit 4, Declaration of Kevin Nielsen on Behalf of County Information Services, LLC an Affiliated Company of Optiver Services B.V.

54. On information and belief, Defendants jointly and/or individually have used, and continue to use, shortwave signals to provide low latency communications for its global HFT enterprise. These shortwave trading methods infringe the Patents-in-Suit.

55. Further identification of Defendants' accused methods and instrumentalities will be provided in Plaintiff's infringement contentions pursuant to the Court's scheduling order and local rules.

56. To the extent applicable, SpectraNet has at all times complied with the marking statute, 35 U.S.C. § 287 for each of the Patents-in-Suit.

57. As set forth below, Defendants individually and jointly make, use, and sell without any license or permission from SpectraNet, technology protected by the Patents-in-Suit.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,959,123**

58. SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

59.     The '123 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '123 Patent recites:

A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:

receiving a request for a particular action to be performed;

encoding a particular value using a format derived to effect message latency into an encoded message for transmission to the remote receiving device over a frequency in an ionospheric HF frequency band, wherein the particular value is known a priori to the remote receiving device as corresponding to the particular action;

determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and

transmitting the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device.

60.     Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '123 Patent, including but not limited to claim 1[1], under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '123 Patent.

61.     For example, Defendants' joint and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device to execute trades.

---

[1] Throughout this Complaint, wherever SpectraNet identifies specific claims of the Patents-in-Suit that Defendants infringe, SpectraNet expressly reserves the right to identify additional asserted claims in accordance with the local patent rules. Specifically identified claims throughout this Complaint are provided for notice pleading only and are not presented as "exemplary" claims of the Patents-in-Suit.

COMPLAINT FOR PATENT INFRINGEMENT                                                    16

62.     Defendants jointly and/or individually receive a request for a particular action to be performed. Defendants jointly and/or individually operate as a global HFT company that profits from making trades on the world's financial markets. It has established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago. Its ionospheric antennas have been observed pointing towards Europe. Chicago to Frankfurt is a known path for HF trading transactions. Defendants' ionospheric antenna station is also linked with a microwave dish antenna that is even closer to the Chicago Mercantile Exchange.[2]

63.     To execute a trade, a request for a particular action to be performed (*e.g.*, buy or sell a certain security) is received by Defendants prior to the transmission of a message in the HF band. On information and belief, the request is received in this District by Defendants prior to being transmitted through one of Defendants' microwave antennas to their Wanatah, Indiana location.

64.     Defendants, jointly and/or individually, encode a particular value using a format derived to effect message latency into an encoded message for transmission to the remote receiving device over a frequency in an ionospheric HF frequency band, where the particular value is known a priori to the remote receiving device as corresponding to the particular action.

65.     Defendants, jointly and/or individually, have transmitted and continue to transmit messages in the ionospheric HF frequency band (shortwave). To enable trade execution at the remote location, upon information and belief, the particular value will be known a priori to the remote receiving device as corresponding to the particular action.

---

[2] *See* Bob Van Valzah, *Shortwave Trading: Part I*, Sniper in Mahwah Blog (May 7, 2018), https://sniperinmahwah.wordpress.com/2018/05/07/shortwave-trading-part-i-the-west-chicago-tower-mystery/.

66.    Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth. Defendant CIS's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator, and authorized power:

Station Locations
(1)  Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37
(2)  WANATAH (LA PORTE), IN - NL 41-27-24; WL 86-51-37
(3)  Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37
Frequency Information

Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37

| Frequency | Station Class | Emission Designator | Authorized Power | Frequency Tolerance (+/-) |
|---|---|---|---|---|
| 13.41-13.57 MHz | FX | 48K0G1D | 384 kW (ERP) | 0.00005 % |
| 13.875-14 MHz | FX | 48K0G1D | 384 kW (ERP) | 0.00005 % |
| 13.883 MHz | FX | 12K0G1D | 384 kW (ERP) | 0.00005 % |
| 14-14.345 MHz | FX | 15K3G1D | 384 kW (ERP) | 0.00005 % |

FEDERAL COMMUNICATIONS COMMISSION

This authorization effective will expire 3:00 A.M. EST    January 01, 2025    and    January 01, 2027

*See* FCC Experimental Radio Station Construction Permit and License for WN2XCR, available at https://apps.fcc.gov/els/GetAtt.html?id=364602&x=.

67.    The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 48K0 allows a 48 kHz bandwidth. To comply with its FCC licenses, Defendants

COMPLAINT FOR PATENT INFRINGEMENT                                                         18

must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

68. Defendants must also determine transmission parameters based on message latency. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions.[3] Thus, on information and belief, Defendants select message parameters, such as modulation type and frequency, to meet or beat latency constraints while complying with licensing constraints such as the predefined channel bandwidth.

69. Defendants, jointly and/or individually, transmit the encoded message in the ionospheric HF frequency band according to the determined transmission parameters to the remote receiving device.

70. Defendants' joint and individual acts of infringement occurred and continue to occur without license or authorization.

71. Defendants, jointly and/or individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, the conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

---

[3] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

COMPLAINT FOR PATENT INFRINGEMENT 19

72.     Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants, jointly and/or individually, actively induce other Defendants and/or related entities to infringe the '123 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

73.     Defendants have been aware of the '123 Patent at least since the filing of this lawsuit and continue to infringe and induce others to infringe at least claim 1 of the '123 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '123 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and in flagrant disregard for SpectraNet's rights in the '123 Patent.

74.     SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

<b><u>COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,516,694</u></b>

75.     SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

76.     The '694 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '694 Patent recites:

> A method for ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device, the method comprising:

> receiving a request to transmit a particular message to the remote receiving device;
>
> encoding the particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, wherein the encoded message is known a priori to the remote receiving device as corresponding to the particular message, and wherein the encoded message is smaller than the particular message;
>
> determining transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth; and
>
> transmitting the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

77.     Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '694 Patent, including but not limited to claim 1, under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '694 Patent.

78.     For example, Defendants' joint and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission of a message in a High Frequency (HF) band to a remote receiving device to execute trades.

79.     Defendants, jointly and/or individually, receive a request to transmit a particular message to the remote receiving device. Defendants jointly and/or individually operate as a global HFT company that profits from making trades on the world's financial markets. It has established control over antenna stations positioned in the vicinity of one of the world's largest market centers in Chicago. Its ionospheric antennas have been observed pointing towards Europe. Chicago to Frankfurt is a known path for HF trading transactions. Defendants'

ionospheric antenna station is also linked with a microwave dish antenna that is even closer to the Chicago Mercantile Exchange.[4]

80.     To execute a trade, a request to transmit a particular message (*e.g.*, buy or sell a certain security) would be received by Defendants prior to the transmission of a message in the ionospheric HF frequency band. On information and belief, the request is received in this District by Defendants prior to being transmitted through one of Defendants' microwave antennas to their Wanatah, Indiana location.

81.     Defendants, jointly and/or individually, encode a particular message using a format derived to effect message latency into an encoded message for transmission on a frequency in an ionospheric HF frequency band, where the encoded message is known a priori to the remote receiving device as corresponding to the particular message, and where the encoded message is smaller than the particular message.

82.     Defendants have transmitted and continue to transmit messages in the ionospheric frequency band. As already explained, shortwave transmissions offer limited bandwidth which necessitates encoding to effect message latency. To enable trade execution at the remote location, upon information and belief, the encoded message will be known a priori to the remote receiving as corresponding to the particular message.

83.     Furthermore, the encoded messages are smaller than the particular message otherwise it would diminish the latency advantage provided by the shortwave medium.

---

[4] *See* Bob Van Valzah, *Shortwave Trading: Part I*, SNIPER IN MAHWAH BLOG (May 7, 2018), https://sniperinmahwah.wordpress.com/2018/05/07/shortwave-trading-part-i-the-west-chicago-tower-mystery/.

COMPLAINT FOR PATENT INFRINGEMENT

84. Defendants, jointly and/or individually, determine transmission parameters for transmission of the encoded message in the ionospheric HF frequency band based at least on (a) message latency and on (b) a predefined channel bandwidth.

85. Defendants CIS's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator, and authorized power.

Station Locations
(1) Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37
(2) WANATAH (LA PORTE), IN - NL 41-27-24; WL 86-51-37
(3) Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37
Frequency Information

Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37

| Frequency | Station Class | Emission Designator | Authorized Power | Frequency Tolerance (+/-) |
|---|---|---|---|---|
| 13.41-13.57 MHz | FX | 48K0G1D | 384 kW (ERP) | 0.00005 % |
| 13.875-14 MHz | FX | 48K0G1D | 384 kW (ERP) | 0.00005 % |
| 13.883 MHz | FX | 12K0G1D | 384 kW (ERP) | 0.00005 % |
| 14-14.345 MHz | FX | 15K3G1D | 384 kW (ERP) | 0.00005 % |

FEDERAL COMMUNICATIONS COMMISSION

This authorization effective January 01, 2025 and will expire 3:00 A.M. EST January 01, 2027

*See* FCC Experimental Radio Station Construction Permit and License for WN2XCR, available at https://apps.fcc.gov/els/GetAtt.html?id=364602&x=.

86. The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 48K0 allows a 48 kHz bandwidth.

87. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range.

88. Defendants must also determine transmission parameters based on message latency. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions.[5] Thus, on information and belief, Defendants select message parameters such as modulation type and frequency to meet or beat latency constraints while complying with licensing constraints such as the predefined channel bandwidth.

89. Defendants jointly, and individually, transmit the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

90. Defendants' joint and individual acts of infringement occurred and continue to occur without license or authorization.

91. On information and belief, Defendants, individually and jointly, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, on information and belief, the conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on

---

[5] *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic*, IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic.

information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

92. Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants, jointly and/or individually, actively induce other Defendants and/or related entities to infringe the '694 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

93. Defendants have been aware of the '694 Patent at least since the filing of this lawsuit and continue to infringe and induce others to infringe at least claim 1 of the '694 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '694 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and in flagrant disregard for SpectraNet's rights in the '694 Patent.

94. SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## **COUNT III: INFRINGEMENT OF U.S. PATENT NO. 12,414,002**

95. SpectraNet reasserts and incorporates herein by reference the allegations of all preceding paragraphs of this Complaint as if fully set forth herein.

96.     The '002 Patent contains 3 independent claims and 20 total claims. Claim 1 of the '002 Patent recites:

A method for ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band, the method comprising:

receiving a request to transmit a particular message towards a remote receiving device;

encoding the particular message into an encoded message using a format derived to reduce message latency, wherein the encoded message is known to the remote receiving device as representing the particular message, and wherein the encoded message is smaller than the particular message; and

transmitting the encoded message over a frequency in an ionospheric HF band using one or more transmission parameters selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for transmission over the ionospheric HF band.

97.     Defendants, jointly and/or individually, have directly infringed and continue to directly infringe one or more claims of the '002 Patent, including but not limited to claim 1, under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, at least by making, using, selling, offering to sell, and/or importing in or into the United States without authorization products, systems, and/or services covered by one or more claims of the '002 Patent.

98.     For example, Defendants' joint and individual use of shortwave trading methods comprises ionospheric Radio Frequency (RF) transmission in a High Frequency (HF) band to execute trades.

99.     Defendants, jointly and/or individually, receive a request to transmit a particular message towards a remote receiving device. Defendants, jointly and/or individually, operate as a global HFT company that profits from making trades on the world's financial markets. Defendants jointly and/or individually operate as a global HFT company that profits from making trades on the world's financial markets. It has established control over antenna stations

positioned in the vicinity of one of the world's largest market centers in Chicago. Its ionospheric antennas have been observed pointing towards Europe. Chicago to Frankfurt is a known path for HF trading transactions. Defendants' ionospheric antenna station is also linked with a microwave dish antenna that is even closer to the Chicago Mercantile Exchange.[6]

100. To execute a trade, a request to transmit a particular message (*e.g.*, buy or sell a certain security) would be received by Defendants prior to the transmission of a message in the HF band. On information and belief, the request is received in this District by Defendants prior to being transmitted through one of Defendants' microwave antennas to their Wanatah, Indiana location.

101. Defendants, jointly and/or individually, encode the particular message into an encoded message using a format derived to reduce message latency, where the encoded message is known to the remote receiving device as representing the particular message, and where the encoded message is smaller than the particular message.

102. Defendants, jointly and/or individually, have transmitted and continue to transmit messages in the ionospheric HF frequency band. As already explained, ionospheric transmissions offer limited bandwidth which necessitates encoding using a format derived to reduce message latency. To enable trade execution at the remote location, upon information and belief, the encoded message will be known to the remote receiving as representing the particular message.

103. Furthermore, the encoded messages were, and are, smaller than the particular message to avoid diminishing the latency advantage provided by the shortwave medium.

---

[6] *See* Bob Van Valzah, *Shortwave Trading: Part I*, SNIPER IN MAHWAH BLOG (May 7, 2018), https://sniperinmahwah.wordpress.com/2018/05/07/shortwave-trading-part-i-the-west-chicago-tower-mystery/.

104. Defendants, jointly and/or individually, transmit the encoded message over a frequency in an ionospheric HF band using one or more transmission parameters selected based on an estimated propagation latency for the one or more transmission parameters and based on a predefined channel bandwidth for transmission over the ionospheric HF band.

105. Defendants CIS's FCC licenses specify that transmissions from the antennas meet various requirements. For example, each licensed frequency band is assigned an emission designator, and authorized power:

Station Locations
(1)  Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37
(2)  WANATAH (LA PORTE), IN - NL 41-27-24; WL 86-51-37
(3)  Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37
Frequency Information

Wanatah (LA PORTE), IN - NL 41-27-24; WL 86-51-37

| Frequency | Station Class | Emission Designator | Authorized Power | Frequency Tolerance (+/-) |
|---|---|---|---|---|
| 13.41-13.57 MHz | FX | 48K0G1D | 384 kW (ERP) | 0.00005 % |
| 13.875-14 MHz | FX | 48K0G1D | 384 kW (ERP) | 0.00005 % |
| 13.883 MHz | FX | 12K0G1D | 384 kW (ERP) | 0.00005 % |
| 14-14.345 MHz | FX | 15K3G1D | 384 kW (ERP) | 0.00005 % |

FEDERAL COMMUNICATIONS COMMISSION

This authorization effective    January 01, 2025    and
will expire 3:00 A.M. EST    January 01, 2027

*See* FCC Experimental Radio Station Construction Permit and License for WN2XCR, available at https://apps.fcc.gov/els/GetAtt.html?id=364602&x=.

106. The first four digits of the emission designator defines the allowable bandwidth for transmissions inside the relevant frequency range. For example, an emission designator that begins with 48K0 allows a 48 kHz bandwidth.

107. To comply with its FCC licenses, Defendants must determine transmission parameters based on the channel bandwidth predefined for the respective frequency range, which are in the ionospheric HF band.

108. Defendants must also determine transmission parameters based on an estimated propagation latency for the one or more transmission parameters. In the high stakes world of HFT trading, speed is critical and the wrong combination of parameters can delay a message. Similarly, fluctuations in environmental conditions can impact the frequencies available for reliable ionospheric transmissions. *See* David Schnider, *Wall Street Tries Shortwave Radio to Make High-Frequency Trades Across the Atlantic,* IEEE SPECTRUM (June 1, 2018), https://spectrum.ieee.org/wall-street-tries-shortwave-radio-to-make-highfrequency-trades-across-the-atlantic. Thus, on information and belief, Defendants select message parameters such as modulation type and frequency to meet or beat latency constraints while complying with licensing constraints such as the predefined channel bandwidth.

109. Defendants, jointly and/or individually, transmit the encoded message over the frequency in the ionospheric HF frequency band using the determined transmission parameters.

110. Defendants' joint and individual acts of infringement occurred and continue to occur without license or authorization.

111. On information and belief, Defendants, jointly and/or individually, also actively direct or control others to perform or use elements of claim 1 such that the infringing activity is entirely attributable to one or more Defendants. For example, on information and belief, the

conduct of subsidiary Defendants is actively controlled by the corporate parents. Further, on information and belief, the Defendants act as each other's agents or contract with each other to perform one or more steps of claim 1, and/or act a joint enterprise.

112. Defendants are also liable under 35 U.S.C. § 271(b) for actively inducing infringement and/or continuing to actively induce infringement. Defendants jointly and/or individually actively induce other Defendants and/or related entities to infringe the '002 Patent. On information and belief, Defendants possess and/or possessed a specific intent to induce infringement, and in fact did and continue to induce infringement.

113. Defendants have been aware of the '002 at least since the filing of this lawsuit and continue to infringe and induce others to infringe at least claim 1 of the '002 Patent. Defendants knew or should have known that their actions would cause direct and indirect infringement of the '002 Patent. On information and belief, Defendants acted with objective recklessness by proceeding despite an objective high likelihood that their actions constituted infringement of a valid patent, where such action constitutes egregious misconduct. Such infringement is thus willful, egregious, wanton, deliberate, and flagrant disregard for SpectraNet's rights in the '002 Patent.

114. SpectraNet has been damaged because of Defendants' infringing conduct. Each Defendant is, thus, liable to SpectraNet in an amount that adequately compensates SpectraNet for the infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

a. A judgment that each Defendant has infringed the Patents-in-Suit;

COMPLAINT FOR PATENT INFRINGEMENT 30

b.　　An injunction barring each Defendant and its officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors and assigns, from further acts of infringement of the Patents-in-Suit; alternatively, a judicial decree that each Defendant pay an ongoing royalty in an amount to be determined for continued infringement after the date of judgment;

c.　　An award of damages adequate to compensate for each Defendant's infringement of the Patents-in-Suit, and in no event less than a reasonable royalty for each Defendant's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

d.　　An award of trebled damages under 35 U.S.C. § 284;

e.　　A declaration that this case is exceptional under 35 U.S.C. § 285;

f.　　An award of Plaintiff's costs and attorneys' fees under 35 U.S.C. § 285 and other applicable law; and

g.　　Any other remedy to which Plaintiff may be entitled.

### DEMAND FOR JURY TRIAL

SpectraNet demands a trial by jury on all claims and issues triable of right by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 20, 2026

/s/ *Paul J. Skiermont*
Paul J. Skiermont (IL. Bar No. 6278464)
Todd A. Martin (TX Bar No. 24066556
Michael D. Ricketts (TX Bar No. 24079208)
**SKIERMONT DERBY LLP**
1601 Elm Street, Suite 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
tmartin@skiermontderby.com
mricketts@skiermontderby.com

Charles C. Koole (CA Bar No. 259997)
**SKIERMONT DERBY LLP**
633 West Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213) 788-4501
ckoole@skiermontderby.com

*Attorneys for Plaintiff*
SpectraNet Technologies LLC

COMPLAINT FOR PATENT INFRINGEMENT                                                  32