# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SPECTRANET TECHNOLOGIES LLC,<br><br>Plaintiff,<br><br>v.<br><br>OPTIVER SERVICES B.V. and COUNTY INFORMATION SERVICES, LLC,<br><br>Defendants. | Civil Action No. 1:26-cv-05857<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF SPECTRANET TECHNOLOGIES LLC'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO THE OPTIVER DEFENDANTS (NOS. 1–19)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of Illinois, and the Local Patent Rules of this District, Plaintiff SpectraNet Technologies LLC ("SpectraNet") requests that each of Defendants Optiver Services B.V. and County Information Services, LLC produce the Documents and Things described below, in accordance with the following Definitions and Instructions, at the offices of Skiermont Derby LLP, 1601 Elm Street, Suite 4400, Dallas, Texas 75201, or by electronic transmission to counsel of record, within thirty (30) days after service of these Requests. Each Defendant shall serve its own written response to each Request. These Requests are continuing in nature through the time of trial and impose the obligations set forth in Fed. R. Civ. P. 26(e).

**DEFINITIONS**

1. "SpectraNet" or "Plaintiff" means Plaintiff SpectraNet Technologies LLC.

2. "You" and "Your" mean the party responding to these Requests, together with its present and former officers, directors, managers, members, partners, employees, agents,

representatives, and consultants acting on its behalf, its attorneys, and any predecessor or successor in interest. Documents in the possession or custody of an Affiliate are within the scope of these Requests to the extent You have the legal right to obtain them.

3. “Affiliate” means (a) any Person that directly or indirectly controls, is controlled by, or is under common control with You, where “control” means the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting interests, by contract, or otherwise; and (b) any joint venture, partnership, or minority investment in which You hold an interest and that owns, funds, operates, uses, manages, or provides services to or in connection with any Accused Instrumentality or any Transmission Site. “Affiliate” does not include an entity in which You hold only a passive trading, market-making, or investment position unrelated to the Accused Instrumentality.

4. “Document” and “Thing” are synonymous with, and equal in scope to, the usage of those terms in Fed. R. Civ. P. 34(a), and include every writing or record of any kind however stored, whether or not asserted to be privileged, including electronically stored information (“ESI”). “Document” includes memoranda, reports, presentations, spreadsheets and financial models, source code and version-control history, configuration files, log files, telemetry, structured data and databases, wiki and Confluence pages, ticketing and issue-tracking records, design and code-review records, voice and video recordings, and network- and system-generated records. A draft, annotated copy, or non-identical copy is a separate Document. Consistent with LPR ESI 2.6(a), these Requests do not seek email or other forms of electronic correspondence; SpectraNet will propound separate email production requests as described in the Instructions below.

5. “Communication” means any transmission or exchange of information between or among two or more Persons, by any means.

6. “Person” means any natural person and any firm, partnership, corporation, limited liability company, association, joint venture, trust, foundation, stichting, governmental body, or other legal or business entity, however organized.

7. “Relate to,” “Related to,” “Relating to,” and “Concerning” mean, in whole or in part, directly or indirectly, relating to, referring to, describing, evidencing, discussing, mentioning, memorializing, concerning, connected with, commenting on, responding to, showing, analyzing, reflecting, or constituting.

8. “Identify,” when used with respect to a Document, means to state the date, author, recipients, subject matter, present custodian, and Bates number (if produced); with respect to a natural Person, means to state that Person’s full name, last known employer, and last known position or title; and with respect to an entity, means to state its full legal name, jurisdiction of organization, and principal place of business.

9. “Patents-in-Suit” and “Asserted Patents” mean U.S. Patent Nos. 10,959,123 (the “’123 Patent”), 11,516,694 (the “’694 Patent”), and 12,414,002 (the “’002 Patent”), together with any additional patent asserted by SpectraNet in This Action or identified in SpectraNet’s disclosures under Local Patent Rule 2.2 or 3.1 (including any amendments or supplements thereto).

10. “Related Applications” means U.S. Patent Application No. 15/436,779; U.S. Patent No. 9,215,726 and the application from which it issued, and every other patent or patent application in the priority chain of any Patent-in-Suit, together with each published version of each such application. Related Applications are not Patents-in-Suit, and a Request reaches a Related Application only where it says so expressly.

11. "Asserted Claims" means the claims of the Patents-in-Suit asserted in SpectraNet's Infringement Contentions under Local Patent Rules 2.2 and 3.1 (including any amendments or supplements thereto).

12. "Claim Element" means any step, limitation, element, or clause of any Asserted Claim.

13. "Priority Date" means the earliest effective filing date to which any Asserted Claim is entitled and, where You contend a different date applies, the date You contend applies.

14. "Prior Art Period" means the period ending on the Priority Date. Where a Request seeks Documents concerning Prior Art, prior invention, conception, reduction to practice, prior commercial use under 35 U.S.C. § 273, or the state of the art, it seeks Documents concerning the Prior Art Period regardless of when the Document itself was created.

15. "Prior Art" means any patent, published application, printed publication, system, apparatus, method, product, service, public use, sale, offer for sale, or other subject matter that You contend qualifies as prior art to any of the Patents-in-Suit under 35 U.S.C. §§ 102 or 103 (in either their pre-AIA or post-AIA forms), or that You contend was otherwise known, used, or available to the public before the Priority Date.

16. "Named Inventor" means Jeffrey Adams, the named inventor of the Patents-in-Suit.

17. "Other Proceeding" means any litigation, arbitration, inter partes review, post-grant review, covered business method review, reexamination, reissue, interference, derivation proceeding, International Trade Commission investigation, patent prosecution, regulatory proceeding, or governmental investigation, whether in the United States or abroad, in which You or any Affiliate has participated.

18. “Relevant Time Period” means January 1, 2010 through the date of trial in This Action, unless a Request specifies otherwise or the definition of “Financial Discovery Period” provides otherwise. This period predates the earliest priority date claimed for the Patents-in-Suit and encompasses the acquisition, financing, construction, and operation of the Transmission Sites, the design and development of the Accused Instrumentality, Your knowledge of the Patents-in-Suit and the Related Applications, and Your continuing conduct.

19. “Financial Discovery Period” means January 1, 2015 through the date of trial in This Action. This period governs every Request seeking financial, trading, transactional, order, quote, execution, Cancellation, position, profit-and-loss, or Latency Data, whether or not the Request says so, except that Documents relating to capital expenditure, infrastructure or connectivity cost, site acquisition, or construction are governed by the Relevant Time Period. The January 1, 2015 start is intended to predate the first operation of any Accused Instrumentality and therefore permits comparison of Your trading before and after that operation began. This term defines the temporal scope of these Requests only. It does not reflect, and shall not be construed as reflecting, any contention or admission by SpectraNet regarding the date on which infringement began, the date of any hypothetical negotiation, or the period for which damages are recoverable, and SpectraNet reserves all rights under 35 U.S.C. §§ 284 and 286.

20. “HF” means the High Frequency band (3 to 30 MHz). “Shortwave” is used interchangeably with HF.

21. “Ionospheric RF Communications” means radio frequency (“RF”) communications in the HF band in which a message-bearing radio signal is transmitted at a frequency and elevation angle suitable for sky-wave propagation, such that the signal is returned toward the Earth by

refraction/reflection in the ionosphere, enabling reception at a remote receiving device beyond line-of-sight range.

22. “Accused Instrumentality” means: (a) any system, network, facility, station, link, path, equipment, hardware, firmware, software, protocol, message format, encoding or decoding scheme, method, process, or service that transmits or receives information by Ionospheric RF Communications, and that You (alone, jointly with others, through any Affiliate, or through any third party) have made, used, operated, controlled, directed, funded, contracted for, purchased, leased, subscribed to, sold, offered for sale, or imported; and (b) each component, system, or facility that generates, formats, encodes, transmits, carries, relays, receives, decodes, or acts upon a message transmitted or received over a system described in subparagraph (a), including any RF, laser, or fiber path connecting such a system to a Trading Venue, data center, or point of presence, and any receiving station wherever located. The term includes each system identified in SpectraNet’s Infringement Contentions (including any amendments or supplements thereto). Nothing falls within this definition unless it satisfies subparagraph (a) or bears to such a system the relationship described in subparagraph (b).

23. “Trading Information” means any data, signal, value, message, instruction, indication, or trigger relating to any Financial Instrument or Trading Venue, including market data, prices, quotes, bids, offers, order instructions, order entry, order modification, order Cancellation, execution reports, fills, trade confirmations, index or reference values, risk or position signals, kill or halt signals, heartbeat or keep-alive messages, and any alpha, signal, or feature derived from any of the foregoing.

24. “Encoding Scheme” means any codebook, code table, code word, dictionary, lookup table, symbol set, alphabet, mapping, schema, protocol specification, message definition,

wire format, or other predetermined correspondence by which a value, symbol, or bit or byte pattern transmitted or received by the Accused Instrumentality is understood by a transmitting or receiving device to correspond to a particular message, action, price, instruction, or state, together with all versions, revisions, and change histories.

25. "Transmission Parameters" means carrier frequency, frequency band, channel assignment, modulation type and order, symbol rate, baud rate, data rate, transmission power, effective radiated power, sampling rate, buffer size, forward error correction and coding rate, interleaving, framing, preamble, guard interval, emission designator, occupied and authorized bandwidth, antenna selection, azimuth, elevation, polarization, and takeoff angle.

26. "Channel Bandwidth" means the occupied or authorized bandwidth of a transmission, including as expressed in any FCC emission designator (for example, 24K0F1D, 48K0D1D, 96K0G1D).

27. "Latency" means the elapsed time required for a message, signal, or instruction to traverse all or any part of a system, including propagation latency, processing latency, message latency, serialization latency, queuing latency, one-way delay, and round-trip time.

28. "Latency Metrics" means any measure of Latency or of the performance, competitive, or economic consequences of Latency, however denominated. Because this terminology is not standardized, the term includes without limitation each of the following and any equivalent: tick-to-trade; tick-to-order; wire-to-wire; wire-to-fire; market-data-to-order; data-to-decision latency; signal-to-order; trigger-to-order; reaction time; response time; hot path or critical path latency; internal and processing latency; gateway-to-gateway latency; round-trip time; one-way latency; propagation delay; time-to-market and time-to-venue; order-to-ack and order-to-fill latency; link, path, and hop latency; cross-venue and inter-exchange latency (including Aurora-

to-Carteret, Chicago-to-New York, Chicago-to-Frankfurt, Chicago-to-London, and Chicago-to-Tokyo measurements); jitter; tail latency and latency percentiles (including p50, p99, and p99.9); latency budget; T0, T1, and T2 timestamps, hardware timestamps, Precision Time Protocol timestamps, and nanosecond timestamps; markouts; effective spread and realized spread; fill ratio and cancel ratio; hit rate; win rate; profit factor; queue position and time priority; race wins and race losses; adverse selection cost; pick-off risk; alpha decay; and toxicity.

29. "Latency Data" means the underlying timestamped records from which Latency or any Latency Metric is or could be derived, as distinct from any report, summary, dashboard, or analysis prepared from them. The term includes without limitation: FIX logs and execution reports (including FIX MsgType 8 messages); native binary order-entry and market-data messages and responses (for example, CME iLink, iLink 3, and MDP 3.0; Nasdaq OUCH and TotalView-ITCH; Eurex T7 Enhanced Trading Interface, Enhanced Order Book Interface, and Enhanced Market Data Interface); drop-copy feeds; order and quote lifecycle records reflecting send, acknowledgment, modification, fill, rejection, and cancel events; market-by-order and market-by-price data, incremental order-book updates, order-book snapshots, and priority identifiers and priority timestamps; packet captures; network and telemetry logs reflecting link-by-link timing; exchange and gateway timestamps; hardware timestamp and clock-synchronization records; and the contents of any tick, time-series, or market-data database (including kdb+, OneTick, or any comparable system). "Latency Data" also includes every identifier and mapping table by which such records may be linked to one another and to Your trading and financial records, including Order Flow ID, Client Order ID (ClOrdID), Original Client Order ID (OrigClOrdID), exchange-assigned OrderID, execution or match identifiers, session identifiers, and any cross-reference table, together with the date, session, and uniqueness conventions applicable to each.

30. “Race” means any event in which two or more market participants, or two or more systems, attempt within a short interval to trade against, or to cancel or modify, the same or a related resting order, quote, or price, including any event You internally characterize as a race, a latency arbitrage, sniping, stale-quote sniping, quote fade, a pick-off, or a free-option event.

31. “Cancellation” means any cancel, cancel-replace, amendment, modification, pull, withdrawal, quote fade, mass quote cancel, cancel-on-disconnect, or purge of a resting order or quote, and any decision, capability, or system functionality to effect any of the foregoing. The term includes the entire message sequence associated with any such attempt, whether successful or unsuccessful, including cancellation requests, pending-cancellation notifications, cancellation acknowledgments, cancellation rejections, cancel/replace rejections, rejection reason codes, and any fill occurring between the request and its disposition.

32. “Non-Infringing Alternative” means any system, method, arrangement, or course of conduct that You contend was acceptable and available during the Relevant Time Period as a substitute for the Accused Instrumentality and that You contend does not practice any Asserted Claim. The term includes any alternative implementation of MF, HF, or VHF transmission (including any implementation that does not encode messages into values known in advance to a receiving device, or that does not select transmission parameters based on message latency and a predefined channel bandwidth), and any alternative employing terrestrial fiber, microwave, millimeter wave, laser, satellite, or hollow-core fiber, and any combination of the foregoing.

33. “FCC Authorizations” means every authorization, license, permit, special temporary authority, construction permit, registration, waiver, or grant issued by, or applied for from, the Federal Communications Commission by You or any Affiliate and relating to any Accused Instrumentality or Transmission Site, including all Part 5 experimental authorizations

(including those bearing call signs WN2XCR and WH2XWU); all filings on FCC Forms 442, 405, 702, 703, and 854 and all Form 854R registrations; all requests for special temporary authority; all Part 90, Part 101, and Part 73 authorizations and applications; all requests for confidential treatment under 47 C.F.R. § 0.459; and all exhibits, narrative statements, technical showings, amendments, renewals, and correspondence relating to any of the foregoing.

34. "Transmission Site" means any parcel of real property, tower, antenna, antenna array, building, shelter, equipment cabinet, data center, colocation cage, or point of presence at or from which any Accused Instrumentality transmits, receives, relays, routes, or processes signals, whether located within or outside the United States.

35. "Trading Venue" means any exchange, designated contract market, swap execution facility, multilateral trading facility, organized trading facility, regulated market, alternative trading system, systematic internaliser, electronic communication network, dark pool, or other execution or trading venue, including CME, CBOT, NYMEX, COMEX, Cboe, Nasdaq, NYSE, IEX, MEMX, MIAX, ICE, Eurex, Xetra, Euronext, the London Stock Exchange, the London Metal Exchange, JPX and the Osaka Exchange, TOCOM, SGX, HKEX, ASX, B3, and any predecessor or successor.

36. "Financial Instrument" means any futures contract, options contract, swap, security, equity, exchange-traded fund or product, foreign exchange instrument, fixed income instrument, commodity, index, digital asset, or derivative of any of the foregoing.

37. "Foreign Affiliate" means any Affiliate organized or operating outside the United States, and any office, branch, desk, or trading operation of You located outside the United States.

38. “Shortwave Modernization Coalition” or “SMC” means the coalition that filed the Petition for Rulemaking docketed by the Federal Communications Commission as RM-11953 on or about April 28, 2023, together with each of its members, counsel, consultants, and participants.

39. “Third-Party Connectivity Provider” means any Person other than You that provides, offers, or has offered to provide HF, shortwave, microwave, millimeter-wave, laser, satellite, hollow-core fiber, or other connectivity or data transmission services, including Raft Technologies Ltd; 3DB Communication Inc.; DPA Mac LLC; Skywave Networks LLC; Skycast Services LLC; McKay Brothers LLC; Quincy Data LLC; Jefferson Microwave LLC; Anova Financial Networks; Vigilant Global; Webline Holdings LLC; Custom Connect; Go West; and Zayo Group.

40. “This Action” and “the Litigation” mean the above-captioned action in which these Requests are served. “Complaint” means the operative complaint in This Action, as amended.

41. “Optiver Group” means Optiver Holding B.V.; Optiver Services B.V.; County Information Services, LLC; Optiver Americas LLC; Optiver US Holding LLC; Optiver Partnership US LP; Optiver Investments UK Limited; Optiver US LLC; Optiver Atlas LLC; Optiver Clearing LLC; Optiver Execution Services LLC; Optiver V.O.F.; Optiver Trading Europe BV; Optiver UK Trading Limited; Optiver Australia Pty Ltd; Optiver Trading Hong Kong Limited; Optiver Taiwan Futures Co. Ltd; and Axiom Trading Limited; each entity identified in the Disclosure Statement and Notification as to Affiliates filed by Optiver Services B.V. and County Information Services, LLC (Dkt. 48), and each of their Affiliates.

42. “CIS” means Defendant County Information Services, LLC.

43. “Wanatah Site” means the antenna station and associated real property located at or near 8399 W. 1050 S., Wanatah, Indiana (at or near 41.457048° N, −86.859156° W), together

with all towers, antennas, buildings, and equipment located thereon, and any other Transmission Site owned, leased, operated, or used by any member of the Optiver Group.

44. "Nielsen Declaration" means the Declaration of Kevin Nielsen on Behalf of County Information Services, LLC, an Affiliated Company of Optiver Services B.V., attached as Exhibit 4 to the Complaint.

45. "Describe," "state all bases," and "explain" mean to set forth fully and with particularity every fact, circumstance, act, omission, event, and date relating to the subject of the Interrogatory; to Identify each Person having knowledge of it; and to Identify each Document (by Bates number where produced) that refers to, evidences, or supports it.

46. The terms "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the Request more inclusive. "All" and "each" shall each be construed as both "all" and "each." "Including" means "including without limitation." The singular includes the plural and the plural the singular, and the past tense includes the present tense and vice versa, wherever necessary to bring within the scope of these Requests any Document that might otherwise be construed to be outside their scope.

## INSTRUCTIONS

1. These Requests are served pursuant to Fed. R. Civ. P. 26 and 34, the Local Rules of this Court, the Local Patent Rules of this District, and the Local Patent Rules for Electronically Stored Information ("LPR ESI"). Unless otherwise stated, each Request seeks Documents created, received, or maintained during the Relevant Time Period.

2. Produce all Documents in Your possession, custody, or control, including Documents held by any Affiliate, agent, attorney, or consultant that You have the legal right to

obtain. The location of a Document outside the United States is not, by itself, a basis to withhold it.

3. Produce Documents as they are kept in the usual course of business or organized and labeled to correspond to the categories in these Requests, in accordance with Fed. R. Civ. P. 34(b)(2)(E). For each Document or group of Documents removed from a file folder, drawer, box, notebook, or other container, produce a copy of the label or identification of that container.

4. Consistent with LPR ESI 2.6(a), these Requests do not seek email or other forms of electronic correspondence. SpectraNet will propound separate email production requests identifying custodians, search terms, and time frames in accordance with LPR ESI 2.6(b)-(e), and will confer with You regarding proper custodians, terms, and timeframe. Nothing in this Instruction excuses production of any other responsive Document (including any memorandum, report, presentation, specification, spreadsheet, model, ticket, wiki page, log, database record, or other attachment) that exists independently of any email transmitting it.

5. Produce ESI in accordance with any ESI protocol or order entered in This Action and, absent one, in a reasonably usable form consistent with LPR ESI 2.5. Produce spreadsheets, financial models, presentations, source code, and databases in native format with all formulas, macros, and embedded objects intact.

6. Pursuant to LPR ESI 2.5(c), SpectraNet makes the following special request for metadata. For each produced Document, produce the following fields to the extent they exist: custodian or source; source file path; file name and extension; author or creator; date created; date last modified; title or subject; parent-child and attachment relationship identifiers; hash value; and, for structured data, the source system, table, field, and extraction-date identifiers.

7. For any Request seeking structured or transactional data (including trading, order, quote, execution, cancellation, log, telemetry, or accounting data), produce the data in native or a mutually agreeable structured format, together with the schema, data dictionary, field definitions, code and enumeration tables, and every identifier and mapping table necessary to link records across systems. Consistent with LPR ESI 2.5(b), the parties shall confer on whether responsive data may be produced by querying the relevant database and producing the result as a reasonably usable and exportable electronic file. Reports, summaries, and dashboards do not substitute for the underlying data, and production of one does not discharge the Request as to the other.

8. Where a Request identifies a category of Document, record, metric, protocol, or identifier by a particular name, that name is illustrative and not limiting. If You maintain a responsive Document or record under a different name, in a different form, or through a different interface, produce it and identify the name You use. The absence of a Document or record bearing the precise label used in a Request is not a basis to withhold a functionally equivalent one, including any ad hoc report, dashboard, notebook, query, script, or native binary message log and its output.

9. These Requests are continuing in nature. Supplement Your responses and production promptly in accordance with Fed. R. Civ. P. 26(e).

10. If You object to any Request in whole or in part, state the objection with specificity and state whether any responsive Documents are being withheld on the basis of that objection, as required by Fed. R. Civ. P. 34(b)(2)(C). Produce all Documents responsive to the unobjectionable portion of any Request.

11. If You withhold any Document on the basis of privilege, work product, or any other protection, produce a log identifying it in accordance with Fed. R. Civ. P. 26(b)(5) and any order

of this Court. SpectraNet acknowledges that discovery concerning reliance on advice of counsel is governed by the timing provisions of Local Patent Rule 3.6, and no Request herein seeks to advance that discovery ahead of the schedule that rule prescribes.

12. If You redact any produced Document, identify each redaction on its face and state the basis for it. Documents redacted in prior submissions to any government agency, including the Federal Communications Commission, must be produced in unredacted form. The protective order in LPR Appendix B is deemed in effect as of the date for Initial Disclosures under LPR 1.4, and confidentiality is therefore not a basis on which to withhold or redact a responsive Document.

13. If any responsive Document was but is no longer in Your possession, custody, or control, or has been destroyed, lost, or is otherwise unavailable, identify the Document, state its last known location and custodian, and state the date, circumstances, and reason for its disposition.

14. If any responsive Document is written in whole or in part in a language other than English, produce it together with every translation of it in Your possession, custody, or control.

15. If You contend that any foreign law, data-protection regime, blocking statute, or confidentiality obligation limits production of any responsive Document, identify the Document, the specific provision relied upon, and the steps You have taken to obtain any necessary consent, waiver, or authorization.

16. Each Request is to be responded to independently, and no Request limits the scope of any other. A Document responsive to more than one Request need be produced only once, provided the production identifies each Request to which it is responsive.

17. Unless a Request states otherwise, produce Documents to the offices of Skiermont Derby LLP, 1601 Elm Street, Suite 4400, Dallas, Texas 75201, or by electronic transmission to counsel of record, within thirty (30) days after service of these Requests.

18. You are reminded of Your obligation to preserve all Documents potentially relevant to This Action, including records subject to short or rolling retention periods: station records under 47 C.F.R. § 5.121; order and audit-trail records under CME Rule 536, 17 C.F.R. §§ 1.31 and 1.35, and Commission Delegated Regulation (EU) 2017/580; and Latency Data held in tick, time-series, or market-data databases subject to automatic expiration. Consistent with LPR ESI 2.3(b), SpectraNet will confer with You regarding the need for, and alternatives to, any discovery concerning Your preservation and collection efforts before initiating such discovery.

**FIRST SET OF REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

Documents sufficient to show Your complete corporate and organizational structure during the Relevant Time Period, including all legal-entity and functional organizational charts identifying each parent, subsidiary, Affiliate, joint venture, branch, division, and trading desk and the direct and indirect ownership percentages among them; and, for each such entity, the Trading Venues on which it trades and the Financial Instruments it trades.

**REQUEST FOR PRODUCTION NO. 2:**

Documents sufficient to show the complete ownership chain from Optiver Holding B.V. to County Information Services, LLC, including the relationship between CIS and each of Optiver Holding B.V.; Optiver Services B.V.; Optiver Americas LLC; Optiver US Holding LLC; Optiver Partnership US LP; Optiver Investments UK Limited; and Optiver US LLC; and each other entity in the chain of ownership between CIS and Optiver Holding B.V. identified in Dkt. 48, at all times during the Relevant Time Period, including all intervening entities and ownership percentages.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents relating to the ownership, formation, capitalization, staffing, and governance of County Information Services, LLC, and to the relationship between CIS and each of Optiver Holding B.V.; Optiver Services B.V.; Optiver Americas LLC; Optiver US Holding LLC; Optiver Partnership US LP; Optiver Investments UK Limited; and Optiver US LLC, and each other entity in the chain of ownership between CIS and Optiver Holding B.V. identified in Dkt. 48, including Documents sufficient to show the use by each Licensee Entity of the premises at 130 East Randolph Street, Suite 800, Chicago, Illinois.

**REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to show all payments, charges, allocations, reimbursements, transfer-pricing entries, and intercompany receivables and payables between or among You and any other entity related to the Accused Instrumentality, Ionospheric RF Communications, network or connectivity infrastructure, or Latency, including the underlying subledger detail in native format; and all Documents relating to the allocation among them of the costs, benefits, capacity, or use of the Accused Instrumentality.

**REQUEST FOR PRODUCTION NO. 5:**

All Documents relating to the Petition for Rulemaking of the Shortwave Modernization Coalition (FCC docket RM-11953, filed on or about April 28, 2023) and the Nielsen Declaration, including all drafts, internal approvals, and supporting materials, and all Documents relating to the execution of that filing by Patrick Cooney, Kevin Nielsen, or by any other person on Your behalf.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents relating to the design, development, procurement, testing, construction, deployment, operation, maintenance, and modification of the Accused Instrumentality, including

all technical specifications, system architecture and network diagrams, block and signal-flow diagrams, link budgets, protocol specifications, interface control documents, requirements documents, design-review materials, internal presentations, memoranda, white papers, wiki and Confluence pages, ticketing and issue-tracking records, incident reports, and post-mortems; together with Documents sufficient to identify the persons most knowledgeable about each of the foregoing and organizational charts for every group, team, or desk responsible.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to identify and describe each Encoding Scheme used, tested, or considered for use with the Accused Instrumentality (including every codebook, code table, message dictionary, symbol set, wire-format specification, and schema, with all versions, revisions, and change histories), and all Documents relating to the design of any message format, framing, alphabet, or encoding for the purpose of reducing, minimizing, or otherwise affecting Latency, including all design rationales, trade-off analyses, benchmark results, and alternatives considered and rejected.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents relating to the selection, determination, computation, configuration, adaptation, or control of Transmission Parameters for the Accused Instrumentality, including every algorithm, heuristic, table, model, script, or configuration that selects, adjusts, or constrains them, and all Documents showing that Latency and Channel Bandwidth are inputs to, constraints on, or objectives of that selection; all Documents relating to buffer size, buffer and queue depth, sampling rate, symbol rate, and data rate, and to any relationship between each and Latency or Channel Bandwidth; and Documents sufficient to show, for each frequency, band, time of day, and period,

the modulation type and order, symbol rate, data rate, transmission power, and emission designator actually used in connection with Ionospheric RF Communications.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents relating to the integration of the Accused Instrumentality with Your trading, order-management, execution, market-data, signal, or risk systems, including interface specifications, message-routing configurations, and the identification of every system that produces or consumes messages carried over the Accused Instrumentality; and all Documents relating to redundancy, failover, path diversity, primary and backup routing, and any logic, configuration, or software that selects among transmission paths on the basis of Latency, availability, or cost.

**REQUEST FOR PRODUCTION NO. 10:**

All Documents relating to the FCC authorizations bearing call signs WN2XCR and WH2XWU, and to every other FCC Authorization held or sought by either Licensee Entity for any Wanatah Site, in complete and unredacted form, including without limitation file number 1238-EX-CN-2022 and all successors, amendments, renewals, modifications, and requests for confidential treatment relating thereto.

**REQUEST FOR PRODUCTION NO. 11:**

All Communications with the Federal Communications Commission, its Office of Engineering and Technology, the National Telecommunications and Information Administration, the Federal Aviation Administration, or any foreign spectrum or telecommunications regulator relating to the Accused Instrumentality or any Transmission Site, including all ex parte filings and notices.

**REQUEST FOR PRODUCTION NO. 12:**

All Documents relating to the program of research or experimentation stated in any application for a Part 5 experimental authorization, including all Documents relating to the objectives, hypotheses, test plans, test protocols, test results, data collection, analysis, and conclusions of that program, all Documents relating to adherence to that program under 47 C.F.R. § 5.111, all reports prepared, requested, or submitted under 47 C.F.R. § 5.73, and all Documents relating to Your policies and practices for creating, retaining, and destroying station records; and all Documents relating to any actual, potential, or alleged non-compliance with, deviation from, or violation of any FCC Authorization or any rule of the Commission, including any inquiry, letter of inquiry, complaint, objection, petition to deny, informal objection, notice of apparent liability, consent decree, or enforcement action, and Your response to each.

**REQUEST FOR PRODUCTION NO. 13:**

All Documents relating to any statement, representation, or internal characterization that any Ionospheric RF Communications facility of CIS facilities are operated for experimental, research, or testing purposes rather than for commercial or trading purposes, and all Documents relating to the actual use of each such facility.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents relating to any capital expenditure, capital appropriation request, authorization for expenditure, capital expenditure request, capital budget submission, or investment approval relating to the Accused Instrumentality or any Transmission Site (including the request, all supporting materials, each level of approval, and the final disposition), together with all business cases, financial models, and net present value, internal rate of return, payback period, return on investment, and return on invested capital analyses prepared in connection

therewith, including all inputs, assumptions, sensitivity analyses, and supporting spreadsheets in native format with formulas intact; and all delegation-of-authority policies, approval matrices, and signature authority schedules governing such approvals.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show, on the most granular basis maintained and separately for each Financial Instrument, Trading Venue, strategy, desk, book, legal entity, and geography, Your gross trading revenue, net trading revenue, trading profit and loss, and associated costs during the Financial Discovery Period for any trading strategy for which You used, or could have used, Ionospheric RF Communications, together with Your total annual revenue, expenses, and net income for each legal entity and each geography.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents relating to the identification of trading strategies, signals, models, or algorithms that use, depend on, are triggered by, or are enabled by messages carried over the Accused Instrumentality (including strategy descriptions, research memoranda, backtests, simulations, and deployment records), together with Documents sufficient to show, for each, the traded volume, notional value, number of orders, number of executions, number of Cancellations, and profit and loss, by Financial Instrument, Trading Venue, and legal entity, during the Financial Discovery Period.

**REQUEST FOR PRODUCTION NO. 17:**

All Documents quantifying or estimating the economic value of a reduction in Latency, including any analysis expressing the value of a millisecond, microsecond, or nanosecond, whether measured in revenue, profit, basis points, fill ratio, queue position, market share, or otherwise; and all Documents relating to the value, importance, benefit, or necessity of the Accused

Instrumentality to You, including any statement that it is necessary, critical, competitively essential, differentiating, or a source of advantage.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents relating to Races, including any analysis of race participation, race wins, race losses, win rate, race duration, and the profit or loss associated with winning or losing a Race; all Documents distinguishing between Races won or lost by aggressive orders and Races won or lost by successful or unsuccessful Cancellations, including any analysis of the relative frequency and economics of each; and the underlying records from which any of the foregoing is or could be derived, including the complete inbound and outbound message sequences for the relevant Financial Instruments and trading sessions (winning and losing messages alike), rejection reason codes, market-by-order and market-by-price data, incremental order-book updates and snapshots, priority identifiers and priority timestamps, and any matching rules or methodology used in any queue-position reconstruction. Produce the venue-specific matching rules and methodology applied, as queue position and race outcomes are not equivalent across venues or matching algorithms.

**REQUEST FOR PRODUCTION NO. 19:**

Documents sufficient to show, for each transmission path of the Accused Instrumentality, the location of the transmitting station, the location of the intended receiving station, the direction and bearing of transmission, the dates of operation, and the Trading Venues served at each end; together with all Documents relating to the routing of messages between the United States and any foreign country over the Accused Instrumentality, including traffic statistics, routing tables, path documentation, and capacity allocations, for each United States-to-Europe, Europe-to-United States, United States-to-Asia, Asia-to-United States, United States-to-South America, South

America-to-United States, United States-to-Canada, Canada-to-United States, United States-to-United States, and any other path in which the location of the transmission station and/or the intended receiving station is within the United States.

Dated: October 12, 2026

/s/ *Charles C. Koole*

Paul J. Skiermont (IL. Bar No. 6278464)
Kevin P. Potere (TX Bar No. 24100658)
Michael D. Ricketts (TX Bar No. 24079208)
**SKIERMONT DERBY LLP**
1601 Elm Street, Suite 4400
Dallas, TX 75201
Phone: (214) 978-6600
Fax: (214) 978-6601
pskiermont@skiermontderby.com
kpotere@skiermontderby.com
mricketts@skiermontderby.com

Charles C. Koole (CA Bar No. 259997)
**SKIERMONT DERBY LLP**
633 West Fifth Street, Suite 5800
Los Angeles, CA 90071
Phone: (213) 788-4500
Fax: (213) 788-4501
ckoole@skiermontderby.com

*Attorneys for Plaintiff*
SpectraNet Technologies LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 12, 2026, counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail.

/s/ *Charles C. Koole*